[Dkt. No. 12, 22, 27]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | |
|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 542; MARINE ENGINEERS BENEFICIAL ASSOCIATION, | |
| Plaintiffs, | Civil No. 15-6019 (RMB/KMW) |
| v. | **OPINION** |
| DELAWARE RIVER AND BAY AUTHORITY, | |
| Defendant. | |

Three motions are currently pending before the Court. Defendant Delaware River and Bay Authority (the "DRBA") has filed both a motion for judgment on the pleadings and a motion to dismiss the action as moot. Def.'s Mot. for Judgment on the Pleadings [Dkt. No. 12]; Mot. Dismiss [Dkt. No. 27]. Plaintiffs International Union of Operating Engineers Local 542 ("Local 542") and Marine Engineers Beneficial Association ("Marine Engineers") (collectively, the "Unions") have cross-moved for judgment on the pleadings. Pls.' Mot. for Judgment on the Pleadings [Dkt. No. 22]. The underlying action seeks a declaration that collective bargaining agreements between the Unions and the DRBA entered into in 2014 are binding, valid and enforceable. For the reasons set forth below, the Court DENIES

the motion to dismiss this action as moot and DENIES the Unions'
motion for judgment on the pleadings.  The Court GRANTS the
DRBA's motion for judgment on the pleadings.

## I.    BACKGROUND

This case concerns a 2014 collective bargaining agreement
between the Unions and DRBA that was cancelled by New Jersey
Governor Chris Christie.  The Unions are both alleged to be the
sole bargaining representatives on behalf of their
constituencies, who are DRBA employees.  Am. Compl. ¶¶ 1, 3, 9,
17.  The DRBA is a bi-state agency created pursuant to a compact
between New Jersey and Delaware (the "Compact").  Id. ¶ 5.  The
Compact was created with Congressional approval in 1962 pursuant
to the Compact Clause of the United States Constitution.  U.S.
Const. art. X, § 10, cl. 3 ("No State shall, without the Consent
of Congress . . . enter into any Agreement or Compact with
another State . . . .").  As part of its responsibilities, the
DRBA operates the Delaware Memorial Bridge, the Cape May/Lewes
Ferry and airports in Cape May, New Jersey and Delaware.  Am.
Compl. ¶ 5.

In 2012, the DRBA began negotiating with the Unions to
reach new collective bargaining agreements.  Id. ¶¶ 10, 11, 18,
19.  On March 26, 2014, the DRBA reached tentative agreements to
do so. Id. at ¶¶ 10, 18.  These agreements covered the time
period for: (a) July 1, 2012 through December 31, 2015 for

2

Marine Engineers, and (b) January 1, 2013 through December 31, 2015 for Local 542.  Id.  Both tentative agreements required certain conditions to be met for them to become effective.  Id. One condition in each – and the condition most relevant to this lawsuit – was that the tentative agreement be ratified by the associated labor union and the DRBA.  Id. ¶ 11, 19.

The Compact sets forth the composition of the Board of Commissioners that was to approve the tentative agreements on behalf of the DRBA.  Pursuant to Article V of the Compact, the Board is comprised of twelve Commissioners: six from Delaware and six from New Jersey.  N.J.S.A. § 32:11E-1, art. V(a). Pursuant to the express language of Article VI, a super-majority of four Commissioners from each state is required for the Board to take action:

> The Commissioners shall have charge of the Authority's property and affairs and shall, for the purpose of doing business, constitute a Board, **but no action of the Commissioners shall be binding or effective unless taken at a meeting at which at least four Commissioners from each State are present, and unless at least four Commissioners from each state shall vote in favor thereof.**

Id. art. VI (emphasis added).  Moreover, under the same Article, votes are subject to "cancellation" by the governor of the Commissioner's respective state:

> The vote of any one or more of the Commissioners from each State shall be subject to cancellation by the

> Governor of such State at any time within 10 days
> (Saturdays, Sundays, and public holidays in the
> particular State excepted) after receipt at the
> Governor's office of a certified copy of the minutes of
> the meeting at which such vote was taken. Each state
> may provide by law for the manner of delivery of such
> minutes and for notification of the action thereon.

Id. Pursuant to the Compact, New Jersey has adopted by statute

a method for handling the delivery of minutes and the

cancellation of votes, N.J.S.A. § 32:11E-6. With regard to the

cancellation of minutes, the statute outlines the exact

obligations of the Governor:

> In the event the Governor shall act to cancel the vote
> of any 1 or more of the commissioners for the State of
> New Jersey, he shall sign a statement of cancellation,
> identifying the vote so canceled by reference to the
> minutes where said vote appears, on or before the
> termination of the time provided for such by Article VI
> of [the Compact], and the said vote shall thereupon be
> deemed to be cancelled. . . . Except as provided in the
> act, no action taken at any meeting of [the DRBA] by any
> commissioner appointed from the State of New Jersey
> shall have any force or effect until the expiration of
> the period herein provided without cancellation by the
> Governor, or his approval, whichever first occurs.

Id.

Against this backdrop, the Board of Commissioners of the

DRBA commenced a vote on a resolution to ratify the tentative

agreements on April 7, 2014. Resolution 14-07 passed by a roll

call vote of 10-1, with one Commissioner recusing. Id. ¶ 24;

Ans. ¶ 12. The vote against and the recusal were both by New

Jersey Commissioners. Am. Compl. ¶ 24. Accordingly, 6

Commissioners from Delaware voted in favor of the resolution and 4 Commissioners from New Jersey voted in favor.  See id.

As pled in the Amended Complaint, consistent with the Compact, the minutes of the Board meeting were then forwarded on to the Governor of New Jersey.  Id. ¶ 24.  On April 22, 2014,[1] Governor Christie "vetoed" the actions by the New Jersey Commissioners, explaining in substantive part:

> In accordance with the authorization contained in Article VI of the Delaware-New Jersey Compact codified as N.J.S.A. 32:11E-1 et seq., I hereby return the minutes with a veto of Resolution 14-07, entitled "Authorizing Three Collective Bargaining Agreements and Salary Increases for Non-Union Employees."

Ans. Ex. 4.

In the wake of Governor Christie's "veto" of the Board's vote, the Unions filed the instant lawsuit in New Jersey state court on July 10, 2015.  Not. Removal ¶ 4 [Dkt. No. 1].  That action was removed to this Court on August 5, 2015, with the Amended Complaint thereafter filed on August 24, 2015.  Am. Compl. [Dkt. No. 6].  Jurisdiction for that removal was premised on federal question jurisdiction over bi-state compacts.  Int'l Union of Operating Eng'rs, Local 542 v. Del. River Joint Toll Bridge Comm'n, 311 F.3d 273, 275 (3d Cir. 2002) ("The construction of a bi-state compact that has been consented to by

---

[1] The Unions do not contend that this letter was not timely.

Congress pursuant to the Compact Clause presents a federal question.") (citing <u>Cuyler v. Adams</u>, 449 U.S. 433, 438 (1981)).

While the matter was pending before this Court, the parties continued to negotiate another collective bargaining agreement. As set forth in the Certification of Vincent P. Meconi, attached as an exhibit to DRBA's motion to dismiss, "[o]n February 17, 2016, tentative agreements were approved by the DRBA Board of Commissions with respect to Local 542 and [Marine Engineers]." Meconi Cert. ¶ 2.  The gubernatorial veto period then expired. <u>Id.</u> ¶ 3.  A collective bargaining agreement was then executed, thereby discharging the obligations in the tentative agreement to finalize them.  <u>Id.</u> ¶ 4.  It is the consummation of this 2016 collective bargaining agreement that DRBA contends renders this action moot.

## II.  <u>MOOTNESS</u>

The Court first addresses the issue of whether the Unions' action is rendered moot by the 2016 Agreements.[2]  Federal courts are not empowered to decide moot issues, as the United States Constitution limits the exercise of judicial power to "cases or controversies".  <u>See</u> U.S. Const. art. III, § 2, cl. 1; <u>Doe v. Delie</u>, 257 F.3d, 313 (3d Cir. 2001) (citing <u>North Carolina v.</u>

---

[2] The parties do not appear to contest the ability of the Court to resolve the issue of mootness based on the record and allegations currently before it.

Rice, 404 U.S. 244, 246 (1971)).  To avoid dismissal on the grounds of mootness, a controversy must exist at all stages of review.  See Doe, 257 F.3d at 313 (citing New Jersey Turnpike Auth. v. Jersey Central Power & Light, 772 F.2d 25, 31 (3d Cir. 1985)).  "This means that, throughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision."  Spencer v. Kemna, 523 U.S. 1, 7 (1998).

The 2014 Agreements and the 2016 Agreements have several notable differences.[3]  Specifically, Frank Bankard, a business representative for Local 542, sets forth in his Affidavit two key differences: (1) the 2014 Agreements provided the Unions with a retroactive raise in 2014 of 1.9%, while the 2016 agreements contain no such raise; and (2) the 2014 Local 542 tentative agreement divided the costs of arbitration evenly between the parties, while the 2016 version pushed the costs upon the loser of the arbitration, which "inhibits the Unions' ability to go to arbitration as they do not have the resources of the Authority."  Bankard Aff. ¶¶ 1, 4-5.  The Court finds

---

[3] Despite its argument that the Unions entered the 2016 agreements voluntarily, the DRBA has not pointed to any language in the 2016 Agreements which purports to invalidate or override the 2014 Agreements.

that these differences both render the enforceability of the 2014 Agreements a non-moot case or controversy.[4]

With regard to the retroactive raise, a 1.9% raise is present in the 2014 Agreements, but not in the 2016 Agreements. If the 2014 Agreements were declared valid and enforceable by this Court, the Unions would have a right to that retroactive raise. That is sufficient under the case or controversy requirement. The DRBA argues that this raise is of little consequence because the 2016 collective bargaining agreement "is for a longer term." It adds, "[i]n the 2014 tentative agreement that was voided by Governor Christie, the wage increases were 1.9%, 1.9%, and 1.9% for 2013, 2014, and 2015, with the contract expiring on December 31, 2015. Under the 2016 fully-executed collective bargaining agreement, the terms are 0%, 0%, 1.9%, 1.9%, and 1.9% for 2013 to 2017." Def.'s Mot. Dismiss Rep. at 3. Put simply, this argument does not convince the Court that there is no injury that accrues to the Unions if the 2014 agreements are not enforced. The fact that different and unrelated benefits – even better benefits – may accrue in a

---

[4] Regardless of Mr. Bankard's involvement with the MEBA negotiations, which the DRBA contests, it is clear from an analysis of the underlying MEBA 2014 and 2016 tentative agreements that the retroactive wage difference is present. Meconi Cert. Ex. B at 1; Am. Compl. Ex. D at 1.

different year on a separate contract does not mean the Unions are not injured if the 2014 agreements are not enforced.

Likewise, and in addition, if the Court declared the 2014 Local 542 collective bargaining agreement binding and enforceable, the arbitration agreement between that union and the DRBA would be subject to an even split of arbitration fees, whereas it is a winner-take-all system under the 2016 version. The DRBA argues that it is speculative that an actual injury will arise, because it would rely on the assumption that Local 542 loses more arbitrations than it wins.  The Court does not agree that the uncertainty of a negotiated-for contract clause being used renders the nullification of the clause a conjectural injury.  Mr. Bankard's affidavit sets forth that the financial condition of the Unions would render them less likely to go to arbitration in a winner-take-all scheme.  Bankard Aff. ¶ 5. Particularly where the DRBA has conceded that this provision was a change in the scheme prior to the 2014 Agreements, Def.'s Mot. Dismiss Rep. at 4, the Court believes that the Local 542 has alleged an actual injury, particularly when considered in addition to the clear denial of a 2014 retroactive raise.

In light of the above, a declaration by this Court that the 2014 Agreements are enforceable would redress the injury that is the deprivation of the retroactive raise and the arbitration-fee

split language under the 2014 Agreements.  The action is not moot and the DRBA's motion to dismiss on that ground is **DENIED**.

### III.  <u>MOTION FOR JUDGMENT ON THE PLEADINGS LEGAL STANDARD</u>

The standard for review of a plaintiff's complaint under Rule 12(c) is identical to that under Federal Rule of Civil Procedure 12(b)(6).  <u>See</u> Fed. R. Civ. P. 12(h)(2); <u>see also</u> <u>Turbe v. Gov't of the Virgin Islands</u>, 938 F.2d 427, 428 (3d Cir. 1991).  "Dismissal of a complaint pursuant to Rule 12(b)(6) is proper 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'"  <u>Hackensack Riverkeeper, Inc. v. Del. Ostego Corp.</u>, 450 F.Supp.2d 467, 484 (D.N.J. 2006) (quoting <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984)).  The allegations contained in the complaint will be accepted as true.  <u>Cruz v. Beto</u>, 405 U.S. 319, 322 (1972).  Plaintiff will also be "given the benefit of every favorable inference that can be drawn from those allegations."  <u>Schrob v. Catterson</u>, 948 F.2d 1402, 1405 (3d Cir. 1991).  However, the plaintiff must make factual allegations and cannot rely on "conclusory recitations of law."  <u>Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.</u>, 836 F.2d 173, 179 (3d Cir. 1988).

### IV.  <u>ANALYSIS</u>

Both parties have moved for judgment on the pleadings. Thinking the issue was the core of the case, the DRBA argued in

its opening brief that language "vetoing" the Board's vote
instead of "canceling" votes of Commissioners is irrelevant and
Governor Christie's actions sufficiently defeated the passage of
Resolution 14-07.  In their responsive briefing, the Unions
disavowed this theory of the case and expressly conceded that
Governor Christie's letter "vetoing" the New Jersey
Commissioners' vote sufficiently acted as a cancellation: "The
Plaintiffs' complaint concedes that the Governor of New Jersey's
veto was in fact a cancellation of the New Jersey Commissioners
vote."[5]  Instead, the Unions offered a different theory: Governor
Christie was able to cancel the votes of the New Jersey
Commissioners who voted in favor of Resolution 14-07, but was

---

[5] The DRBA cannot be blamed for this misunderstanding, as the
Unions' Amended Complaint certainly appears to premise their
claim to relief on the Governor's use of "veto" instead of
"cancel".  Am. Compl. ¶ 27 ("Governor Christie did not cancel
the votes of the [C]ommissioners he in fact vetoed the all [sic]
of the actions  of the New Jersey Commissioners.").  Moreover,
the responsive briefing, despite admitting the cancelled votes
in favor of the Resolution, still asserts that "[t]he
Defendant's reliance on using the term veto and cancel
interchangeably is misplaced.  As can be seen by both the
language of the Compact and the language of N.J.S.A. §32:11 E-6,
it is clear that the terminology used is cancel, not veto.  As
such the Governor of New Jersey did not effectively cancel the
votes by the Commissioners.").  Nevertheless, the Court takes
the Unions' concession in their briefing that Governor
Christie's letter cancelled the Commissioners' votes at their
word, particularly where the substance of the responsive brief
responds not to the DRBA's arguments that "veto" effectively
canceled the votes, but rather that the "key issue this matter
turns on . . . whether the Governor can cancel an abstained
vote."  Pls. Mot. for Judgment on the Pleadings Br. at 10.  As
noted, infra, this argument does not prevail, either.

unable to cancel the vote of the New Jersey Commissioner who
abstained from voting.  Pls.' Mot. for Judgment on the Pleadings
Br. at 9 ("Stripped of its hyperbole the key issue in this
matter is whether the Governor of New Jersey can cancel the vote
of a Commissioner who abstained from the vote.").  If the
Governor was not able to so cancel a vote, "then the Unions must
prevail as the vote was six in favor of passing the Resolution,
five opposed to the resolution, and one abstention." Id.  The
Unions are incorrect.

The DRBA, based on the final allegation of the Complaint,
had anticipated this alternative theory of the case and also
addressed it in their opening brief:

> The Amended Complaint contains a throw-away allegation
> that, even if the Letter had constituted an effective
> exercise of the Governor's cancellation authority,
> "Christie could not cancel the abstention vote.  This
> left the final vote of six to five in favor of
> ratification." [Am. Compl. ¶ 28].  It is unclear how
> Plaintiffs reached a tally of six to five in favor of
> ratification."  But even were their tally correct, such
> a tally would fail to "ratify" the Agreements.  As
> discussed in [an earlier portion of the brief], Article
> VI states that no action of the Board shall be binding
> or effective unless at least four Commissioners from New
> Jersey and at least four Commissioners from Delaware
> vote in favor of the Action.  A "six to five" vote fails
> to meet this plain requirement.  Therefore, Plaintiffs'
> allegation in paragraph 28 of the Amended Complaint must
> be rejected.

Def.'s Mot. for Judgment on the Pleadings Br. at 28 n.4.  The
DRBA is correct.  As noted above, Article VI contains a super-
majority requirement that all actions be passed not only by a

majority, but by four Commissioners from each state.  N.J.S.A. §
32:11E-1, art. VI ("[N]o action of the Commissioners shall be
binding or effective unless taken at a meeting at which at least
four Commissioners from each State are present, and unless at
least four Commissioners from each state shall vote in favor
thereof.").  By the Unions' express admission that Governor
Christie cancelled the votes of New Jersey Commissioners voting
in favor of the Resolution, supra, the Unions have, in effect,
also admitted that the vote did not pass Article VI muster.  In
fact, by definition, no vote of six votes could ever carry a
resolution.

Tellingly, in their responsive briefing, the Unions do not
address the Article VI issue raised by the DRBA.  Indeed, the
only references to Article VI contained anywhere in their brief
are in quotes from other documents.  Pls.' Mot. for Judgment on
the Pleadings Br. at 7, 8.  Instead, the Unions double down on
the fact that the resolution, even with canceled votes, passed
with six votes in favor and five opposed.  Id. at 9 ("[T]he
Governor of New Jersey could not cancel a vote [of] a member of
the board who abstained . . . [as such,] the vote was six in
favor of passing the Resolution, five opposed to the resolution,
and one abstention.")  As the DRBA rightly points out, the
Unions' extended discussion of whether the "abstention" was
actually a "recusal", and whether the Governor could cancel an

abstention or recusal, is of absolutely no moment.  If, regardless of whether the abstention or recusal could have been cancelled, the Resolution only "passed" with six votes, it did not pass at all under the express terms of the Compact.  Because the Unions have woefully failed to address this point in their opposition brief,[6] and because the Court agrees with the DRBA's reading of Article VI, the Court finds that judgment on the pleadings in favor of the DRBA is proper.[7]

## V.   <u>CONCLUSION</u>

By this Court's reading of the Unions' argument and as alleged in the Amended Complaint, the Unions have conceded that Governor Christie's April 2014 letter cancelled the votes of the New Jersey Commissioners who voted in favor of Resolution 14-07, which purported to ratify the 2014 tentative agreements between

---

[6] The Unions' request to file a sur-reply – which was tabled during the briefing on the mootness issue – does not mitigate their opposition brief's silence on the issue, as the DRBA clearly developed the Article VI argument in its opening brief and the Court would have expected a response to it in the opposition brief, without the need of a sur-reply.

[7] Should the Unions feel that the Court has misconstrued their argument and that the issue of Governor Christie's letter reading "veto" instead of "cancel" is a part of the case, it may move for reconsideration of the Court's ruling under the applicable rules, setting forth a clear explanation of why that issue was not conceded.  That said, having read the DRBA's briefing on the issue, the Court is inclined to agree with it that such an argument would place form over substance, and various factors render Governor Christie's actions sufficient to invalidate the Resolution.  Nevertheless, that issue – because of the Unions' explicit framing of their argument – is not before the Court, let alone with sufficient clarity.

the DRBA and the Unions.  Under Article VI of the Compact,
however, four New Jersey Commissioners are required to vote in
favor of a resolution for it to pass.  The Unions have ignored
this requirement in the Amended Complaint and their brief.
While the action is not moot, the Unions have failed to state a
claim and judgment on the pleadings is therefore proper.
Accordingly, the DRBA's motion to dismiss and the Unions' motion
for judgment on the pleadings are DENIED.  The DRBA's motion for
judgment on the pleadings is GRANTED.

DATED: November 18, 2016

                                        s/Renée Marie Bumb
                                        RENÉE MARIE BUMB
                                        UNITED STATES DISTRICT JUDGE